***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Houser and the briefs and arguments of the parties. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence, or rehear the parties. The Full Commission adopts the Opinion and Award of Deputy Commissioner Houser with minor modifications.
 ***********
The Full Commission finds as a fact and concludes as matters of law the following, which were entered into by the parties as:
 STIPULATIONS
1. From June 1, 2004 through the present, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act, defendant-employer employed three *Page 2 
or more employees, and an employer-employee relationship existed between the defendant-employer and plaintiff.
2. The carrier on the risk is ACE USA.
3. Plaintiff's average weekly wage on May 21, 2007 was $1,460.00.
4. Plaintiff was out of work following from May 22, 2007 through October 3, 2007.
5. The documents contained at pages 54, 55, 56, and 60 of Stipulated Exhibit (2) were received by defendant-employer's medical department on or about the date of each of the respective documents.
6. At and subsequent to the hearing before the deputy commissioner, the parties submitted the following:
 a. A Notebook of Stipulated Exhibits, which was admitted into the record and marked as Stipulated Exhibit (2) (150 pages);
 b. A Record from the Commonwealth of Virginia Department of Motor Vehicles, which was admitted into the record and marked as Stipulated Exhibit (3) (2 pages), and;
 c. Records from Potomac Hospital in Woodbridge Virginia, which was admitted into the record and marked as Stipulated Exhibit (4) (7 pages).
 ***********
Based upon all the competent evidence from the record, the Full Commission finds as follows:
 FINDINGS OF FACT *Page 3 
1. As of the hearing date before the Full Commission, plaintiff was thirty-two (32) years of age, with his date of birth being October 4, 1976. Plaintiff is a high school graduate and has taken some community college courses.
2. Prior to his employment with defendant-employer, plaintiff worked for approximately four years as a pharmaceutical technician at Proctor and Gamble, where his duties included operating and performing maintenance on machinery. In that capacity, plaintiff's duties involved intermittent standing and walking, and approximately seventy-five percent (75%) of the time involved sitting. Prior to his Proctor and Gamble employment, plaintiff worked for less than two years in a family owned retail business selling computers, which involved mostly sitting. For two to three years prior to that, plaintiff was employed by Floyd's Enterprises, a company owned by his father that repaired and framed houses. Plaintiff supervised a work crew and spent approximately one-half of his day standing and one-half sitting.
3. Plaintiff began working for defendant-employer on June 1, 2004 at its Eden, North Carolina brewery. Plaintiff was hired as a mechanic to maintain the machinery in the packaging area. Plaintiff's normal shifts were eight hours per day for five days per work. Plaintiff also worked overtime. When working overtime, plaintiff typically worked four additional hours during a week day and an additional eight hour shift during the weekend.
4. Plaintiff did not have any pain or other symptoms in either of his feet until early July 2005. Plaintiff experienced burning in the center of his left foot in July 2005, which progressively worsened. For this condition, plaintiff sought treatment from family physicians on August 4, 2005. Plaintiff has continued to experience some left foot pain since July 2006. Plaintiff has not experienced pain or other symptoms in his right foot. *Page 4 
5. Plaintiff's job as a mechanic for defendant-employer typically required him to be on his feet, walking and standing, two to three hours during an eight-hour workday. The floor surfaces in defendant-employer's plant which plaintiff would stand or walk on were concrete and metal or fiberglass grating. During the remainder of an eight-hour workday plaintiff worked on machinery in a seated position, used a computer, rode a bicycle to areas on the plant floor and took prescribed breaks. The standard breaks during an eight-hour workday included a thirty-minute meal break and two fifteen-minute breaks.
6. In mid July 2004, plaintiff began working a significant amount of overtime performing his duties as a mechanic. Plaintiff typically worked at least fifty-two (52) hours per week and frequently sixty (60) hours or more during the twelve months before he sought medical treatment from his family on August 4, 2005.
7. On August 4, 2005, plaintiff reported experiencing left foot pain to his family physician at Dayspring Family Medicine. The results of an x-ray were normal and plaintiff was prescribed anti-inflammatory medication. A bone-scan on August 11, 2005 revealed intense tracer activity in the left mid foot.
8. On August 17, 2005, plaintiff sought additional treatment for his left foot from Dr. Scott McGinley. Dr. McGinley diagnosed plaintiff as having a mid foot strain of the left foot. For this condition, Dr. McGinley instructed plaintiff to reduce his working hours, to wear high work boots tightly laced, and prescribed anti-inflammatories. Additionally, Dr. McGinley restricted plaintiff to working forty (40) hours per week as of August 17, 2005.
9. As of September 15, 2005, when he returned to Dr. McGinley, plaintiff's left foot condition was improving. At that time, Dr. McGinley opined that plaintiff's left foot injury would *Page 5 
take some time to completely heal and that he should continue to work no more than forty (40) hours per week.
10. On September 29, 2005, Dr. McGinley released plaintiff to return to full duty work with no restrictions. Thereafter, plaintiff returned to working his normal hours for defendant-employer which included overtime.
11. Prior to September 29, 2005, when he was working limited hours, plaintiff's left foot pain had improved. Between September 29, 2005 and May 21, 2007, plaintiff performed his normal duties as a mechanic, but also continued to experience some left foot pain. Plaintiff used ice and topical ointments for relief of the symptoms in his left foot during this period of time.
12. On May 5, 2007, a vehicle driven by plaintiff, while stopped in traffic, was struck in the rear by a second vehicle traveling approximately twenty (20) miles per hour. Plaintiff then went to a hospital emergency room where he reported experiencing neck and upper back pain. Based upon the credible evidence of record, plaintiff did not sustain an injury to his left foot as the result of this motor vehicle accident.
13. On May 21, 2007, plaintiff's job duties for defendant-employer were changed as he was assigned to train to operate a drop packer machine. The work involved in operating this machine was different than that as a mechanic in that plaintiff would be required to walk and stand significantly more during a workday.
14. On May 21, 2007, the drop packer machine was not running when plaintiff reported to work. Therefore, plaintiff was required to "pile off" which involved moving empty cases from a conveyer and carrying and stacking the cases on a fiberglass grating. This job required plaintiff to pick up six empty cases from the conveyer and quickly run over and across some twenty to forty feet of grating. Plaintiff then squatted and placed the pile of six boxes on the grating and would *Page 6 
then run back and pick up six more boxes and carry those boxes to the grating and place them on top of the first six boxes. The boxes were stacked twelve high. When plaintiff stopped to place a stack of cases, he placed his left foot slightly ahead of his right foot. Plaintiff performed this task steadily and repeatedly from approximately 3:00 p.m. until 9:00 or 10:00 p.m. making one hundred and fifty (150) to two hundred (200) trips, carrying six of these boxes on each trip from the conveyer to set them on the grating. During this period, plaintiff remained on his feet except for his scheduled breaks. The "pile off" job requires considerably more walking and stooping than the mechanic job.
15. The grating on which plaintiff was working consisted of sections. In some areas, the sections did not fit together evenly and when walking across these areas, plaintiff's foot was at two different levels. There were legs on some parts of the platform holding the grating that were not touching the floor causing the grating to give when plaintiff stepped on these sections.
16. After performing the "pile off" work for two and one-half to three hours, plaintiff began experiencing severe pain in the center of his left foot, which increased throughout his shift. The pain in plaintiff's left foot was in the middle and radiated into the entire foot. During the last hour or two of his shift, plaintiff's duties changed but he continued to stand on the grating and climbed up and down three steps every couple of minutes.
17. On May 22, 2007, after experiencing sharp pain when he stood to get out of his bed, plaintiff sought treatment from his family physicians at Dayspring Family Medicine. At that facility, plaintiff reported to Dr. Paul Sasser that his left foot began hurting the previous day after working in a new job for approximately two to three hours. Dr. Sasser noted in his records that plaintiff was experiencing a recurrence of left foot pain. New x-rays were negative. Dr. Sasser *Page 7 
limited plaintiff to his regular job and instructed him not to do any extended or continuous standing and prescribed an anti-inflammatory medication.
18. On June 1, 2007, plaintiff retuned to Dr. Sasser for his left foot pain, and was referred to Dr. McGinley. Dr. Sasser limited plaintiff to no continuous standing until he could be examined by Dr. McGinley or, in the alternative, medically excused plaintiff from work. Because defendant-employer could not accommodate plaintiff's restrictions, his out-of-work status began on May 22, 2007 when Dr. Sasser limited plaintiff to his regular job and to no extended or continuous standing.
19. On June 4, 2007, plaintiff was examined by Dr. McGinley, at which time he reported experiencing left foot pain in the middle of his foot and arch area which plaintiff related to a change in his job duties. Plaintiff further explained to Dr. McGinley that he had been training for a new job which requires him to squat and stand throughout the day. Dr. McGinley diagnosed plaintiff as having a left mid foot strain related to his work for defendant-employer. Dr. McGinley instructed plaintiff to remain on light duty and only to do intermittent squatting, climbing, and standing. Defendant-employer was unable to accommodate the restrictions assigned by Dr. McGinley.
20. On June 18, 2007, plaintiff returned to Dr. McGinley with ongoing left foot symptoms. Dr. McGinley placed plaintiff's left foot in a cast boot for three weeks and referred him to a foot and ankle specialist, Dr. Paul Bednarz. Additionally, Dr. McGinley continued plaintiff's out-of-work status until he could be examined by Dr. Bednarz due to the fact that defendant-employer could not accommodate plaintiff's work restrictions.
21. On August 23, 2007, plaintiff was examined by Dr. Bednarz who initially believed plaintiff's condition was either arthritis or a stress fracture. Dr. Bednarz opined that plaintiff's *Page 8 
symptoms may be the result of overuse. Dr. Bednarz ordered an MRI, instructed plaintiff to discontinue use of the walker boot, and recommended custom-made orthotics to better distribute pressure over the plantar aspect of his foot. Additionally, Dr. Bednarz medically excused plaintiff from work through October 1, 2007.
22. Dr. Bednarz opined that the MRI of plaintiff's left foot and his clinical findings indicated that plaintiff had experienced stress in the left mid foot area, which likely led to his arthritis. On September 14, 2007, plaintiff was fitted for custom-made orthotics by the physical therapy department in Dr. Bednarz's office.
23. Dr. Bednarz last examined plaintiff on October 1, 2007, at which time, plaintiff had used his orthotics for approximately one week and his left foot condition was improving. Dr. Bednarz noted at this appointment that plaintiff had a left base of the second metatarsal stress reactive strain with secondary early second TMT joint arthritis. Dr. Bednarz explained that a stress reactive change is where the bone develops edema or swelling in response to stress placed on it that exceeds its normal physiologic capabilities. Dr. Bednarz has further explained that this condition is usually consistent with an early stress fracture versus just trying to build more new bone where the stress is applied. Dr. Bednarz recommended that plaintiff continue wearing the orthotics and to also wear comfortable shoes as well as continue taking anti-inflammatory medication. Plaintiff was instructed to follow up if his left foot condition persisted, but at that time, Dr. Bednarz was positive about plaintiff's recovery through conservative management. Dr. Bednarz also instructed plaintiff to limit his work to forty hours per week and eight hours per day as of October 4, 2007.
24. In response to an inquiry from defendant-employer, Dr. Bednarz stated on October 2, 2007 that the time limitations he assigned were imposed because of the prolonged standing and walking in plaintiff's job and that the eight hour limitation did not include time which plaintiff could *Page 9 
sit for training or meetings. Additionally, Dr. Bednarz noted that these limitations were to continue for one to two months.
25. Plaintiff returned to work for defendant-employer performing his duties as a mechanic in the packaging area on October 4, 2007. Defendant-employer allowed plaintiff to return to work at forty hours per week as a temporary accommodation. The limitation of plaintiff's physical work for forty hours per week was continued through January 12, 2008 as plaintiff's left foot condition continued to improve. Since that date, plaintiff has worked his regular hours, including overtime with his pain level being manageable.
26. Dr. McGinley testified that plaintiff's work duties on May 21, 2007 exacerbated his pre-existing left mid foot strain, which Dr. McGinley had treated since June 4, 2007. Dr. McGinley opined that plaintiff's left mid foot strain led to the early onset of arthritis in that area.
27. Dr. Bednarz testified that plaintiff's work duties on May 21, 2007 aggravated the pre-existing condition in his left foot. Dr. Bednarz has further testified that he would need to examine plaintiff again to express an opinion on whether plaintiff has reached maximum medical improvement.
28. Plaintiff's assignment to train as an operator beginning May 21, 2007, machine operator work on a production line, and performance of the "pile off" duties and other operator duties on May 21, 2007, introduced unusual working conditions for plaintiff. These circumstances interrupted plaintiff's normal work routine and introduced conditions likely to result in an injury.
29. On May 21, 2007, plaintiff sustained an injury by accident arising out of and in the course of his employment with defendant-employer. *Page 10 
30. Plaintiff's material aggravation to his pre-existing, non-disabling left mid foot condition was causally related to and was the direct and natural result of his May 21, 2007 injury by accident.
31. Based upon the credible vocational and medical evidence of record, and as a result of his May 21, 2007 injury by accident, plaintiff was unable to earn any wages in his position with defendant-employer or in any other employment for the period of May 22, 2007 through October 3, 2007.
32. Based upon the credible vocational and medical evidence of record, and as a result of plaintiff's May 21, 2007 injury by accident, plaintiff was only able to earn limited wages with defendant-employer for the period of October 4, 2007 through January 13, 2008.
33. Subsequent to plaintiff's May 21, 2007 injury by accident, the treatment by Dr. Sasser, Dr. McGinley, and Dr. Bednarz was reasonable and medically necessary to effect a cure or provide relief.
34. On May 21, 2007, plaintiff's average weekly wage was $1,460.00, thereby entitling plaintiff to the maximum weekly compensation rate for 2007 of $754.00.
 ***********
Based on the foregoing findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On May 21, 2007, plaintiff's average week wage was $1,460.00, thereby entitling plaintiff to the maximum compensation rate for 2007 of $754.00. N.C. Gen. Stat. § 97-2(5).
2. On May 21, 2007, plaintiff sustained an injury by accident arising out of and in the course of his employment with defendant-employer. N.C. Gen. Stat. § 97-2(6). *Page 11 
3. Plaintiff's pre-existing, non-disabling left mid foot condition was the direct and natural result of and causally related to his May 21, 2007 injury by accident, which materially aggravated his condition.Id.
4. Based upon the credible vocational and medical evidence of record, and as a result of his May 21, 2007 injury by accident, plaintiff is entitled to be paid by defendants temporary total disability compensation at the rate of $754.00 per week for the period of May 22, 2007 through October 3, 2007. N.C. Gen. Stat. § 97-29.
5. Based upon the credible vocational and medical evidence of record and as a result of his May 21, 2007 injury by accident, plaintiff is entitled to be paid by defendants temporary partial disability compensation for the period of October 4, 2007 through January 13, 2008. N.C. Gen. Stat. § 97-30. The amount of this compensation is to be determined by the parties and paid by defendants to plaintiff based on the documentary evidence in this record. Id.
6. As the result of his May 21, 2007 injury by accident, plaintiff is entitled to have defendants pay for all related medical expenses incurred or to be incurred, including expenses associated with the treatment provided Dr. Sasser, Dr. McGinley, and Dr. Bednarz, subject to the provisions of N.C. Gen. Stat. § 97-25.1, when the medical bills have been approved according to established Industrial Commission procedures. N.C. Gen. Stat. §§ 97-25; 97-25.1.
7. Counsel for plaintiff is entitled to an attorney fee based upon hours spent by plaintiff's counsel on the appeal of this matter to the Full Commission as set forth by affidavit. N.C. Gen. Stat. § 97-88.
 ***********
Based on the foregoing findings of fact and conclusions of law, the Full Commission makes the following: *Page 12 
 AWARD
1. Defendants shall pay to plaintiff total disability compensation at the rate of $754.00 per week for the period of May 22, 2007 through October 3, 2007. Having accrued, this compensation shall be paid to plaintiff in a lump sum. This compensation is subject to the attorney's fee approved herein.
2. Defendants shall pay to plaintiff temporary partial disability compensation at a rate to be determined by the parties for the period of October 4, 2007 through January 13, 2008. Having accrued, this compensation shall be paid to plaintiff in a lump sum. This compensation is subject to the attorney's fee approved herein.
3. Defendants shall pay all medical expenses incurred or to be incurred by plaintiff as the result of his May 21, 2007 injury by accident, including expenses associated with the treatment provided Dr. Sasser, Dr. McGinley, and Dr. Bednarz, subject to the provisions of N.C. Gen. Stat. § 97-25.1, when the medical bills have been approved according to established Industrial Commission procedures.
4. A reasonable attorney's fee of twenty-five percent (25%) of the compensation awarded herein is approved for counsel for plaintiff. From the compensation having accrued, this fee shall be deducted from the amounts due plaintiff and paid directly to counsel for plaintiff.
5. Plaintiff's counsel is hereby ordered to file within 15 days from receipt of this Opinion and Award an affidavit of hours spent prosecuting plaintiff's claim on appeal before the Full Commission.
6. Defendants shall pay the costs.
This the 28th day of April 2009. *Page 13 
S/___________________ STACI T. MEYER COMMISSIONER
CONCURRING:
 S/___________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/___________________ CHRISTOPHER SCOTT COMMISSIONER